# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 2:09-cr-00443-KJD-LRL |
| v. ) | |
| ) | MOTION TO SUPPRESS |
| DAVID M. PERELMAN, ) | INVOLUNTARY STATEMENTS (#18) |
| ) | |
| Defendant. ) | |

## REPORT & RECOMMENDATION

The defendant, David M. Perelman, is under indictment on one count of Theft of Government Property in violation of 18 U.S.C. § 641 and one count of Unauthorized Wearing of a Purple Heart in violation of 18 U.S.C. § 704(a) and (d). The matter before the court is Perelman's Motion to Suppress Involuntary Statements (#18), in which he contends that statements he made to Special Agents of the Department of Veteran Affairs Office of the Inspector General during an interview were involuntary, primarily on grounds that the agents deceptively failed to disclose that they were conducting a criminal investigation into his claims to be a Purple Heart recipient and his status as a disabled veteran and because his use of prescription medications, combined with his PTSD, deprived him of the capacity to competently waive his rights. Also under submission is the government's Opposition (#20), and defendant's Reply (#23). An evidentiary hearing was held on this issue on March 1, 2010. Having considered the motion, opposition, reply, and the testimony offered at the evidentiary hearing, the court submits this Report and Recommendation.

### THE EVIDENCE

Based on the testimony adduced at the evidentiary hearing and the exhibits attached to the

parties' papers, the court finds the following facts have been established by a preponderance of the evidence. At approximately 9:00 a.m. on July 10, 2009, Special Agent Gregory Fitzgerald of the Department of Veteran Affairs Office of the Inspector General ("VAOIG") contacted Perelman at his place of employment, the VA's Northwest Clinic. Perelman had been employed as a clerk with the VA Southern Nevada Healthcare System for approximately three years. SA Fitzgerald identified himself as a special agent with the VAOIG and stated that he was conducting an investigation and wanted to speak with Perelman. Perelman agreed to meet SA Fitzgerald at his office at the East Clinic for an interview at 10 a.m.

Concerned about the interview, Perelman went to speak to his union steward, Gregory Blackburn in Blackburn's office. Blackburn had previously represented Perelman in a union matter. Blackburn testified that Perelman seemed anxious and was seeking representation from Blackburn because he had to go speak with an agent from the VAOIG. Blackburn called the agent, who was later identified as SA Fitzgerald, and asked him why he needed to speak with Perelman. Blackburn specifically inquired whether it was a criminal matter. The agent told Blackburn that it was. Blackburn testified, "I thanked him and I hung up the phone and then I turned to Mr. Perelman and I told him I can't help you because it's a criminal investigation." Blackburn explained that he could not accompany Perelman because it was a criminal matter, and the union does not get involved in criminal matters. Blackburn then advised Perelman, "if he got there and felt uncomfortable, he should thank them and walk out. I said that's what I would do."

After leaving Blackburn's office, Perelman drove himself to the East Clinic. The drive was approximately thirteen miles. SA Fitzgerald met Perelman in the reception area of the clinic and escorted him through the clinic to a conference room. The conference room had a second door which led to the outside and had windows to the outside. The room was approximately fifteen feet by fifteen feet and contained one large rectangular table with enough seating for ten people. Neither conference room door was locked. Special Agent Michael Morse joined SA Fitzgerald and Perelman in the conference room. Both agents presented their credentials. SA Morse was wearing a suit jacket, slacks,

and white dress shirt. SA Fitzgerald was dressed in a suit and tie. Neither agent's sidearm was visible.

After checking Perelman's identification, SA Fitzgerald asked him to take a seat. He then explained to Perelman that he was a special agent with the VAOIG, "just like any other special agent he had heard of from another agency such as the FBI, ATF, DEA, except that my investigations involve criminal matters affecting the VA." He further explained that Perelman was there voluntarily, that he was not under arrest, that he did not have to speak to the agents, and if he did speak with the agents he could stop and leave at any time. Perelman stated that he understood and was willing to speak with the agents.

SA Fitzgerald explained that he and SA Morse investigate various types of crime, including false claims submitted to the VA and that's what they wanted to talk to Perelman about. The agents produced a *Garrity* federal employee advisement of rights form. SA Fitzgerald read the form to Perelman and gave it to Perelman to read. The *Garrity* form states: "You are being contacted to solicit your cooperation in an official investigation regarding misconduct or improper performance of official duties. . . . The matter under investigation could constitute a violation of law that could result in the criminal prosecution of the responsible individuals." The form provides a blank to fill in what "This inquiry concerns," in which the agents wrote "False Claims." Beneath this section is typed:

> You have the right to remain silent if your answers may tend to incriminate you. If you do decide to answer questions or make a statement, you may stop answering at any time.
>
> Anything you say may be used as evidence both in an administrative proceeding or any future criminal proceeding involving you.
>
> If you refuse to answer the questions posed to you on the grounds that the answers may tend to incriminate you, you cannot be removed (Fired) solely for remaining silent, however, your silence can be considered in an administrative proceeding for any evidentiary value that is warranted by the facts surrounding your case.

Perelman signed the form under the "Acknowledgment" section, which states:

> I understand the warnings and assurances stated above and I am willing to make a statement and answer questions voluntarily. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

SA Fitzgerald explained that the interview would be tape recorded and turned on the recorder.[1] The interview lasted approximately fifty minutes. Nearly twenty-four minutes into the interview, and after having elicited several inculpatory statements from Perelman, the agents made it explicit that Perelman, himself, was the subject of their criminal investigation and the matter was being sent to the United States Attorney's Office. One agent told him "this is not an administrative matter. This is not a let's just get the VA to re-review it, maybe uh, you know, your disability claim." Perelman began to express concerns about his family, his job, and his life. He did not ask to end the interview. The questioning continued, and Perelman made more inculpatory statements. Around forty minutes into the interview, Perelman stated that he was "all stressed out," and took some kind of pill. The agents offered Perelman water with which to take the pill, which he declined. Perelman's demeanor, speech, and ability to focus did not appear to change after he took the pill. At the end of the interview, the agents turned off the recorder and asked whether Perelman would be willing to make a written statement. Perelman agreed that he would.

Before making the written statement, Perelman asked to use the restroom, which was located outside the conference room. SA Fitzgerald explained where it was, and Perelman walked there and back to the conference room unescorted. He sat down to begin the written statement. SA Fitzgerald explained that he would help with the statement for the purposes of clarity and length and read aloud the advisement of rights at the top of the form.[2] SA Fitzgerald then went over statements that Perelman had made, asking if each was correct. If Perelman agreed that a statement was correct, SA Fitzgerald told him to write it down. At one point, Perelman wanted to write a statement differently than how SA Fitzgerald had said it, and SA Fitzgerald told Perelman to write it Perelman's way. When the written

---

[1] The recording of the interview was submitted as Exhibit C to the Motion (#18) and admitted as the government's Exh. 1 at the hearing.

[2] With the identifying blanks filled in the form reads, "I, David M. Perelman, residing at 7620 Twisted Pine Ave., having been duly sworn as provided by law, make the following statement freely and voluntarily to SA Greg Fitzgerald, a Special Agent with the Office of Inspector General, Department of Veteran Affairs, Criminal Investigations Division:" Exh. D to Mot. (#18).

4

statement was complete, Perelman was directed to read it over to make sure he agreed with it. SA Fitzgerald had Perelman initial any line-outs or scratch-outs and sign the statement. Perelman then left the clinic and drove away.

## DISCUSSION

Perelman concedes that because he was not in custody at the time of the interview, the agents were not required to give him an advisement of *Miranda* rights. Reply (#23) at 2; *see Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that the Fifth Amendment requires suppression of statements made during a custodial interrogation unless the defendant has been apprised of, and validly waives, his rights to silence and/or the presence of an attorney). The question here is solely one of voluntariness: whether Perelman's confession was the "product of a rational intellect and free will," *see United States v. Pinion*, 800 F.2d 976, 980 (9th Cir. 1986) (citations omitted), or whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004) (citing *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981)) (quoting *United States v. Male Juvenile*, 280 F.3d 1008, 1022 (9th Cir. 2002)) (other citation omitted); *see also Haynes v. Washington*, 373 U.S. 503, 513-14 (1963). It is the government's burden to prove by a preponderance of the evidence that a criminal defendant's statement was voluntary. *Bautista*, 362 F.3d at 589 (citing *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981)). The factual inquiry focuses on (1) the conduct of law enforcement officials in creating pressure, and (2) the defendant's ability to resist that pressure. *Mincey v. Arizona*, 437 U.S. 385, 399-401 (1978). Coercion by the authorities is a necessary element of this test. *Colorado v. Connelly*, 479 U.S. 157 (1986).

Citing *Commonwealth of the Northern Mariana Islands v. Mendiola*, 976 F.2d 475, 484 (9th Cir. 1993) (overruled on other grounds by *George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997)), Perelman asserts that 18 U.S.C. § 3501(b) should serve as a starting point in determining the voluntariness of a confession. Section 3501(b) provides that the following factors be considered in making the determination:

> (1) the time elapsed between arrest and arraignment; (2) the defendant's knowledge of the nature of the offenses for which he was suspected or charged; (3) whether the defendant was advised or knew that he was not required to make a statement and that any statement made could be used against him; (4) whether the defendant was advised of the right to the assistance of counsel; and (5) the presence or absence of counsel when questioned and when making the confession.
>
> The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

Perelman points to factors (3), (4), and (5) of § 3501(b) as particularly relevant to this case. Specifically, Perelman argues that the *Garrity* advisement of rights form deceptively gave him the impression that he was being investigated for workplace, rather than criminal, misconduct, and further failed to advise him of his right to the assistance of counsel. Consequently, the agents were able to first convince Perelman that he was the target of an administrative investigation, then inform him of the true nature of the interview only after eliciting inculpatory statements. Reply (#23) at 3-4 (analogizing to *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion)) (holding that the district court must suppress statements made after a *Miranda* warning where post-*Miranda* confessions are the result of a deliberate two-step interrogation technique).

These factors do little to bolster Perelman's argument. Factor (3), whether defendant was advised or knew that he was not required to make a statement and that any statement made could be used against him, was satisfied in this instance. SA Fitzgerald told Perelman directly that he didn't have to speak with the agents, and that should he decide to speak to the agents he could stop and leave at any time. The *Garrity* form, which SA Fitzgerald read to him and which Perelman himself read and signed, further advised him, "You have the right to remain silent if your answers may tend to incriminate you. If you do decide to answer questions or make a statement, you may stop answering at any time." Factors (4) and (5), which relate to the presence of counsel are inapplicable here. Perelman, himself, concedes that the agents were not required to advise him of his right to the assistance of counsel, because he was not in custody. While counsel may have been helpful to Perelman during the course of the interview, lack of counsel in such a non-custodial interview does not, in itself, render the

circumstances surrounding the confession inherently coercive.

The uncontroverted testimony of the agents indicates that the physical aspects of the interview were not coercive. The conference room was not particularly small, had windows to the outside, and contained two exits, one of which led outdoors. Neither exit door was locked so as to prevent exit. The interview did not take place in either an isolated setting or in an environment overrun with police presence; it was in a room within a VA clinic during the clinic's normal business hours. Perelman was not restrained in any fashion nor did the agents threaten to restrain him. When he asked to use the restroom, the agents told him where it was, and Perelman walked to and from the restroom unescorted. Neither agent made a show of physical force or threatened Perelman with physical force. At no point during the interview or while writing the statement did the agents threaten Perelman with arrest or suggest that he was not free to leave. The agents informed Perelman that he could leave at any time. Perelman drove himself to the clinic, and thus had the means to leave if he so desired. Neither agent displayed a sidearm. The interview was not particularly lengthy, lasting only fifty minutes. All of these facts weigh heavily against a finding of official coercion.

Nor does the evidence support Perelman's contention that the agents deceptively passed themselves off as investigating a purely administrative matter by, among other things, presenting the *Garrity* form, thereby rendering his statements involuntary. SA Fitzgerald specifically told both Perelman and Blackburn that he was investigating a criminal matter. He later told Perelman that he and SA Morse investigate crimes for the VA, such as false claims submitted to the VA, and that's what they wanted to talk to him about. Thereafter the agents presented the *Garrity* form, on which they indicated that the inquiry concerned "False Claims." SA Fitzgerald both read the form aloud and gave Perelman the opportunity to read it himself. The form alerted Perelman that his statements could be used "in any future criminal proceeding involving you." It further alerted Perelman, "You have the right to remain silent if your answers may tend to incriminate you. If you do decide to answer questions or make a statement, you may stop answering at any time." Perelman signed the form acknowledging that he understood it and was speaking to the agents voluntarily.

None of the evidence supports Perelman's assertion that the agents deceptively acted as though they were investigating an administrative matter. To the contrary, the evidence indicates that Perelman was told repeatedly that VAOIG agents investigate criminal matters. The *Garrity* form did not somehow erase the agents' representations about their role as VAOIG criminal investigators; nor was it improper to present Perelman with a *Garrity* form, insofar as he was being questioned about activities that could affect his employment with the VA. That Perelman may have failed to grasp that *he* was the target of a criminal investigation when he made inculpatory statements to known special agents does not, in itself, render those statements involuntary.

Finally, the evidence does not indicate that Perelman was so affected by the intoxicating effects, if any, of his prescription medications that he lacked the capacity to competently waive his rights.[3] Rather, the agents' testimony and the recording of the interview indicate that Perelman "was coherent, gave responsive answers to questions, and was able to remember accurately [details]." *United States v. George*, 987 F.2d 1428, 1431 (9th Cir. 1993) (citations omitted) (holding statements voluntary even though defendant was in the hospital suffering from "an apparent drug overdose" inasmuch as his injuries "did not render him unconscious or comatose"). Perelman's speech was clear, he seemed to understand the questions he was being asked, and even challenged the agents' version of events. He appeared to be oriented and responsive and had a notepad and pen with him to take notes during the interview. Perelman also drove himself to the interview site and away from it. SA Morse testified that had Perelman appeared intoxicated or otherwise incapacitated, he would have directed him to the clinic for his own safety and for reasons of liability.

SA Fitzgerald noted that while Perelman walked with a limp, he didn't stumble, lose his balance, or show any other signs of difficulty walking when he arrived at the clinic, went to the restroom, or left the building. Though he took a pill during the interview, it did not appear to affect Perelman's ability to participate in the interview. Rather, even as he was writing his statement,

---

[3] While Perelman asserts in his Motion (#18) and Reply (#23) that the drugs, mixed with PTSD, diminished his capacity to waive his rights, the record contains no evidence that Perelman suffered from PTSD.

Perelman was actively engaged in how to characterize his actions. None of the evidence indicates that Perelman was incapacitated by his medication, nor that his will was overborne by physical or psychological coercion, so as to render his confession involuntary. The evidence indicates quite the contrary.

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Perelman's Motion to Suppress Involuntary Statements (#18) should be denied.

DATED this 1st day of June, 2010.

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**